Filed 5/14/13  P. v. Wiggins CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053321 |
| v. | (Super.Ct.No. FVA701726) |
| KRIST ANTONIO WIGGINS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, Gary W. Brozio and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

Defendant Krist Antonio Wiggins shot and killed Police Officer Sergio Carrera during a SWAT team's execution of a search warrant on defendant. Defendant appeals from judgment entered following a jury conviction for involuntary manslaughter, as a lesser included offense of murder. (Pen. Code, § 192, subd. (b).)[1] After a mistrial and retrial of the personal use enhancement, the jury found true the enhancement. (§ 12022.5, subd. (a).) The trial court sentenced defendant to 14 years in prison, consisting of four years for involuntary manslaughter plus 10 years for the firearm allegation.

Defendant raises numerous issues regarding both trials, including challenges to the sufficiency of evidence, instructional error, evidentiary error, and ineffective assistance of counsel (IAC). We conclude there was no prejudicial or cumulative error and affirm the judgment.

II

FACTS

**First Trial—Involuntary Manslaughter**

On October 18, 2007, the Rialto Police Department SWAT team executed a narcotics search warrant at defendant's residence. The police were informed there were gang members with narcotics and weapons at the residence, and the gang members were known to be violent.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

The SWAT team arrived at defendant's residence at about 7:00 a.m., dressed in full SWAT attire. The officers gave a loud knock-notice and demanded entry. There was no response. The SWAT team "set the pick" into the door, which meant wedging a metal bar between the door and door frame, and ramming the pick with "the ram," a brown or gold car. When the pick was rammed, the door popped open. The SWAT team then used a "flashbang," which is a distraction or diversionary device that makes a flash and very loud noise that sounds like an explosion.

After forcing open the front door, the SWAT team rapidly entered defendant's residence to take control of the house and prevent injury. Officers repeatedly yelled, "Police department. Search warrant." Upon entering, the officers saw an African-American male (defendant), lying on a couch, and an African-American female with a small child, standing next to the couch. Defendant stood up, looked at the officers, and ran down the hallway. A line of SWAT officers, known as a stack, quickly followed defendant, fearing he might escape, destroy evidence, take a hostage, or obtain a weapon. While running after defendant, the officers continued loudly announcing their identity as police and their purpose of executing a search warrant.

At the end of the hallway, defendant glanced back at the officers pursuing him and entered a bedroom. Officer Black followed defendant into the bedroom, with Officer Jones directly behind Black, and the other officers in the SWAT team stack behind Jones. When Black entered the room, defendant lunged at him with both arms and hit Black in the face. Black was wearing SWAT attire and was carrying his rifle in a three-point sling over his right shoulder. Black and defendant crashed into each other and Black fell on

top of defendant.  Black let go of his rifle, which was slung under his right armpit.  Defendant lay on the ground on his back, facing Black, who was lying on top of defendant's chest, looking at defendant.  Black's gun was between defendant's and Black's bodies.

Black and defendant fought violently, with defendant trying to force Black off him and Black struggling to hold defendant down.  Black felt as if he were fighting for his life.  He punched defendant in the face, while constantly yelling, "police department" and, "stop resisting."  Black felt pressure in his chest area where his gun was.  Black heard Jones yell, "Taser, Taser, Taser."

Jones, who was the second officer in the stack to enter the room, testified he saw Black and defendant fall to the ground, chest to chest, with defendant on his back and Black on top, straddling defendant.  Jones could not see defendant's or Black's arms.  Jones jumped over defendant's legs, yelling, "Taser" at least three times.  As Jones dropped to his knees to fire his taser at defendant's stomach area, Jones heard one shot fire from Black's rifle.  Jones heard two more shots as he grabbed the rifle barrel near his face and tased defendant.  The third officer in the stack, Officer Carrera, was standing near the bedroom doorway when Black's rifle fired.  One of the three bullets fired from the rifle hit Carrera in the face.  Black heard, "Officer down.  Officer down."  Shortly thereafter, Carrera died from a gunshot wound to his head.

While still holding the rifle barrel, Jones tased defendant again.  Defendant continued to resist.  Jones hit him in the head, admonished him to stop resisting, and tased him again, to no avail.  Meanwhile, Black and defendant continued to fight.

4

Eventually, Black rolled defendant over on his stomach, and with another officer's assistance, subdued defendant and handcuffed him. Jones heard Officer Quinonez say on the radio, "officer down." Jones looked out into the hallway and saw in the doorway opening, an officer being carried out by two or three SWAT officers.

Police searched defendant's residence and found ammunition and possible drug-sales evidence, including pay-owe slips, baggies, and money. The police did not find any narcotics or weapons. DNA analysis showed that defendant was a major contributor to a DNA sample found on the right side of the rifle's frame. He was also a possible contributor to a low-level DNA sample taken from Black's rifle's trigger.

A trajectory analysis and reenactments of the incident confirmed the testimony of the officers involved in the shooting. Sheriff's deputies also performed experiments ruling out accidental discharge of the rifle and establishing that only a finger pull on the trigger could fire the rifle. One of the reenactments showed that the rifle fell onto the right side of Black's body and, from that position, defendant could grab the gun, easily manipulate it, and fire it. The expert witness who conducted the trajectory analysis testified that a single person fired all three shots, which were fired in rapid succession, with the first shot hitting Carrera. The expert witness also concluded none of the shots were caused by Jones grabbing the barrel of the rifle.

An emergency room physician and taser expert testified that a taser in the "drive stun mode" used on defendant would have caused pain but would not have affected his ability to use his hands to fire the rifle and would not have resulted in defendant involuntarily firing the rifle.

5

Defense witness, Nashalia Bell, who was defendant's girlfriend, testified that she was present when the police executed the search warrant. Defendant was asleep on the couch. She did not hear any announcement that the police were serving a search warrant. When Bell heard commotion outside the front door, she tried to wake up defendant but was unable to do so. The next instant, the police kicked open the door, entered, and ordered everyone down. Bell and her two children ran into the kitchen.

**The Second Trial—Personal Firearm Use**

During the second trial, the jury found true the enhancement allegation that defendant personally used a firearm in committing involuntary manslaughter. (§ 12022.5, subd. (a).) The following evidence was presented during the second trial.

Black followed defendant down the hallway and into a bedroom. As Black entered the bedroom carrying a rifle, defendant hit Black in the jaw and Black let go of his rifle, which hung in a three-point sling. The two men fell to the ground and a violent fight between Black and defendant ensued. The men were chest to chest, with defendant on his back and Black on top of him, hitting defendant and trying to hold him down, in an attempt to subdue him.

Black felt pressure between defendant's body and Black's torso. Black thought his rifle was between him and defendant's body, but could not see it. Although Black could not see defendant's hands, Black knew defendant's hands were in between Black's and defendant's bodies. Black told defendant to show him his hands and could feel defendant's hands pushing Black off him. Black heard Jones say, "Taser, Taser, Taser," and then heard gunshots and defendant softly moan. Black could not see his rifle when

6

he heard the gunshots.

Jones testified that when he entered the room yelling, "Taser, Taser, Taser," defendant and Black were violently fighting on the ground, chest to chest. Defendant's upper body and shoulders were rapidly moving. Jones could not see defendant's hands. They appeared to be under defendant, between Black and defendant. Jones could not see Black's rifle. Jones noticed there was space between defendant's and Black's stomach and chest areas where Jones intended to apply the taser to defendant. Before applying the taser, Jones heard a gunshot coming from directly in front of his face, about six inches away. Jones looked up and saw the barrel of Black's rifle, pointing toward the bedroom door. The rifle was under Black's right arm and shoulder area, sticking up toward the doorway.

After hearing the first gunshot, Jones applied the taser to defendant's stomach area and heard defendant scream in pain. Jones initially thought application of the taser might have caused defendant to fire the rifle or the gun could have accidentally fired from getting caught on a piece of Black's clothing or equipment. Jones was uncertain as to whether defendant or Black fired the rifle. As Jones fired the taser, with his other hand he reached for Black's rifle. Black heard two more shots fired. Jones grabbed the barrel of Black's rifle and pushed the rifle to the side, leaning it up against the wall near the door. Jones could not see defendant's or Black's hands. Jones believed defendant's hands were between Black's and Jones's chests. Later, when asked where the shots came from, Jones said the gunshots were "friendly fire," because they were fired from Black's gun. Jones did not know who pulled the trigger. Initially, Black did not realize the shots

7

were fired from his gun. Black testified he did not pull the trigger.

Forensic evidence established that Black's rifle fired the bullet that killed Carrera. Defendant was found to be a possible major contributor to a DNA sample found on the rifle frame, just above the grip. His DNA was also on the rifle's trigger. The prosecution's DNA expert testified the DNA evidence indicated defendant touched the rifle's trigger area. Gunshot residue was found on defendant's hands after he was arrested. This indicated defendant either handled, fired, was in close proximity of the rifle when it fired, or contacted a surface that had gunshot residue on it. The defense DNA expert testified defendant's DNA could have been transferred to the rifle by his blood or by his saliva from shouting or talking. Cross contamination could also account for a false positive result.

A California Department of Justice criminalist, William Matty, testified that Black's rifle was a semiautomatic, in which the trigger had to be pulled to fire each shot. Seven and a half pounds of pressure was required to pull the trigger. The rifle would not fire accidentally. It would only fire from a trigger pull. Matty also testified that a trajectory analysis established that the three bullets traveled a path consistent with Black's rifle being positioned as Jones and Black described it, with the gun in the bedroom, with the barrel pointing upward, angled toward the doorway. The bullets traveled north to south in an upward direction.

Dr. Donald Dawes, an emergency room physician with expertise in tasers, testified that a dry stun gun (taser) can be used for pain compliance through localized pain of electrical shock. Using the taser this way, by applying it to a person's abdomen, would

8

not affect other parts of the body or cause involuntary muscle contraction, such as with the hands. A pathologist testified that Carrera's bullet wound to the head was consistent with the trajectory analysis, assuming Carrera was looking down from the doorway.

The sheriff's homicide unit performed a reconstruction of the shooting, which showed that the rifle could have been fired under the circumstances described by the officers, consistent with the trajectory analysis, with defendant on his back. The potential for accidental fire of Black's rifle was also tested and accidental fire was ruled out.

III

SUFFICIENCY OF EVIDENCE OF INVOLUNTARY MANSLAUGHTER

Defendant contends there was insufficient evidence to support his conviction for involuntary manslaughter. We disagree.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; see also *People v. Hill* (1998) 17 Cal.4th 800, 848-849.)

Involuntary manslaughter is defined as an unlawful killing without intent to kill and without implied malice that occurs (1) during the commission of an unlawful act, other than a felony, or (2) in the course of a lawful act committed with criminal negligence. (§ 192, subd. (b).) "Involuntary manslaughter, like other forms of homicide,

9

also requires a showing that the defendant's conduct proximately caused the victim's death." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1009 (*Butler*).)

Defendant argues there was insufficient evidence of intent and causation. Specifically, with regard to the second theory of involuntary manslaughter based on criminal negligence, defendant asserts the evidence failed to establish that defendant's acts of fleeing or resisting proximately caused Carrera's death. Defendant also argues there was insufficient evidence that defendant's act of lawful resistance was dangerous or created a high risk of death or great bodily injury (GBI).

A. *Foreseeability of Harm—Criminal Negligence*

Involuntary manslaughter based on criminal negligence "requires proof of criminal negligence—that is, 'aggravated, culpable, gross, or reckless' conduct that creates a high risk of death or great bodily injury and that evidences a disregard for human life or indifference to the consequences of the conduct. [Citations.]" (*People v. Garcia* (2008) 162 Cal.App.4th 18, 27-28.) The prosecution must show that "a reasonable person would have been aware of the risk. [Citation.] Thus, even if the defendant had a subjective, good faith belief that his or her actions posed no risk, involuntary manslaughter culpability based on criminal negligence is warranted if the defendant's belief was objectively unreasonable. [Citations.]" (*Butler*, *supra*, 187 Cal.App.4th at pp. 1008-1009, fn. omitted.)

Here, there was substantial evidence establishing that, regardless of whether defendant's act of fleeing and resistance was lawful or unlawful, his conduct was dangerous. There was evidence the SWAT team forcefully entered defendant's home,

10

dressed in full SWAT attire, with guns drawn. Defendant fled, running down the hall. There was evidence defendant looked over his shoulder and saw the armed SWAT team running after him. The officers yelled repeatedly, "police," and announced their purpose of serving a search warrant. The risk of harm escalated exponentially when defendant lunged at Black as he entered the bedroom and hit him in the face. Defendant continued to resist, even after Black ordered him to stop, and attempted physically to subdue defendant, with Black's rifle wedged between defendant's and Black's bodies. Defendant continued resisting after Jones entered the room and yelled, "Taser, Taser, Taser," and Black repeatedly yelled, "stop resisting." A reasonable person would have concluded that under such circumstances there was a high risk of death or GBI. The evidence was thus more than sufficient to establish criminal negligence, as well as the misdemeanor crime of resisting, delaying or obstructing a police officer, in violation of section 148.

### B. Causation

Defendant argues there was also insufficient evidence that his conduct of fleeing and resisting proximately caused Carrera's death. Defendant acknowledges that evidence established that a bullet from Black's gun killed Carrera, but argues there is no evidence defendant fired the gun or did anything else to cause the rifle to discharge and kill Carrera. Defendant asserts that this is why the jury in the first trial was unable to agree on the firearm use allegation.

In reviewing the evidence in the light most favorable to the judgment, we conclude a finding of proximate cause was reasonably justified by the circumstances, even though

11

the jury could reach a contrary finding. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138; *People v. Bean* (1988) 46 Cal.3d 919, 932.) Here, a finding of proximate causation "requires that the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather than a remote consequence that is so insignificant or theoretical that it cannot properly be regarded as a substantial factor in bringing about the death. [Citations.]" (*Butler*, *supra*, 187 Cal.App.4th at pp. 1009-1010.)

Evidence supporting a finding that defendant's acts proximately caused Carrera's death include evidence defendant fled armed SWAT officers and lunged at Black in a dimly lit bedroom. When Black attempted to detain and subdue defendant, defendant resisted by trying to push Black off him. Black's rifle was lodged between the two men, hanging from a three-point sling. Officers were yelling at defendant to stop resisting and an officer was threatening to tase defendant. Under these circumstances, a reasonable inference could be made that, during the heat and chaos of the moment, defendant fired Black's rifle. This evidence was sufficient to support findings that defendant's acts of fleeing, resisting, and discharging Black's rifle were a substantial factor in proximately causing Carrera's death.

IV

FAILURE TO INSTRUCT ON CAUSATION

Defendant contends the trial court erred in failing to instruct the jury on the causation element of involuntary manslaughter. Defendant argues the jury should have been instructed that, in order to find causation, the jury had to find that Carrera's death was a reasonably foreseeable or natural and probable consequence of defendant fleeing

12

when the SWAT team entered his home.

In reviewing a claim of instructional error, we consider the jury instructions as a whole, and we consider each instruction in the context of the entire charge to the jury. (*People v. Haskett* (1990) 52 Cal.3d 210, 235; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)  We will reverse a conviction only if there is a reasonable likelihood that, in the context of the instructions as a whole, the jury understood the court's explanation as the defendant asserts.  (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526.)

The trial court was required to instruct on each of the elements of involuntary manslaughter.  As to the element of causation, "Involuntary manslaughter, like other forms of homicide, also requires a showing that the defendant's conduct proximately caused the victim's death."  (*Butler*, *supra*, 187 Cal.App.4th at p. 1009.)  Defendant complains that the modified version of CALCRIM No. 580 eliminated instruction on the element of proximate causation.  The instruction allowed the jury to find defendant guilty of involuntary manslaughter without finding that defendant's act of fleeing and resisting Black was the proximate cause of Carrera's death.  Defendant argues that, had the court properly instructed on causation, the jury could have found there was no causation, based on evidence defendant was startled out of a deep sleep when officers burst into his home.  Also, there was evidence he did not know the intruders were law enforcement, since his home was dimly lit and the officers were armed and masked.  In addition, several days before, unknown individuals had fired at defendant's home.  Defendant asserts the jury could have also reasonably found that Carrera's death was not a foreseeable or natural and probable consequence of defendant resisting Black, because defendant was merely

13

trying to push Black off defendant while Black was striking him. There also were no witnesses who saw where Black's gun was or observed who pulled the trigger.

We conclude the trial court adequately instructed the jury that, in order to find defendant guilty of involuntary manslaughter, the prosecution must prove that his act was the proximate cause of Carrera's death. During a hearing on proposed jury instructions, the court and counsel discussed causation and the natural and probable consequences doctrine in conjunction with CALCRIM Nos. 240 (causation) and 520 (first and second degree murder with malice aforethought). The prosecutor requested the court to add to CALCRIM No. 520 instruction that an act causes death if it is a natural and probable consequence of the act. The prosecutor noted the court did not need to give CALCRIM No. 240 on causation because instruction on causation was included in CALCRIM No. 520. The trial court agreed, concluding CALCRIM No. 240 was a repetitive, unnecessary instruction. Defense counsel also agreed but noted that the only problem with not giving CALCRIM No. 240 was that instruction on causation was buried in the murder instruction.

Later in the discussion of jury instructions, the court and parties agreed to give a modified version of CALCRIM No. 580 on involuntary manslaughter. The proposed instruction did not elaborate on causation, substantial factor, or the natural and probable consequence doctrine. CALCRIM No. 580, as given to the jury, stated in relevant part: "The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed or committed a lawful act, but acted with criminal negligence; [¶]

14

AND  [¶]  2.  The defendant's acts unlawfully *caused* the death of another person."
(Italics added.)

The Bench Notes for CALCRIM No. 580 state with regard to causation:  "If causation is at issue, the court has a sua sponte duty to instruct on proximate cause. [Citation.]  If the evidence indicates that there was only one cause of death, the court should give the 'direct, natural, and probable' language in the first bracketed paragraph on causation. If there is evidence of multiple causes of death, the court should also give the 'substantial factor' instruction in the second bracketed paragraph on causation. [Citations.]"

In the instant case, the version of CALCRIM No. 580 given to the jury did not include the two paragraphs on the natural and probable consequences doctrine or substantial factor.  Defendant argues this was error.  We disagree because the court instructed the jury on these principles in connection with murder.  CALCRIM No. 520, as given to the jury regarding murder, stated in relevant part: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  [¶]  There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death."

This language in CALCRIM No. 520 is essentially the same language stated in the two paragraphs that defendant complains were omitted from the modified version of CALCRIM No. 580 given to the jury. There was no need to restate those same principles again with regard to involuntary manslaughter. In considering CALCRIM No. 580 in the context of the entire charge to the jury, we conclude the trial court did not err in omitting the causation language from CALCRIM No. 580, because the same language was included in CALCRIM No. 520. "'""The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole."''" [Citation.]" (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 147.)

V

JURY QUESTION NO. 31

Defendant contends the trial court's response to jury question No. 31 erroneously stated that a finding of criminal negligence was not required to prove involuntary manslaughter if the jury relied on the unlawful act theory. Defendant asserts that the court should have responded that criminal negligence is required regardless of whether defendant committed a lawful or an unlawful act. Defendant complains that, instead, the court instructed the jury that, if it relied on the unlawful act theory, it was not required to find criminal negligence.

The trial court instructed the jury with CALCRIM No. 580, on involuntary manslaughter, which stated the jury could find involuntary manslaughter liability under either of two possible theories: (1) The defendant committed a crime that posed a high risk of death or great bodily injury (unlawful act theory); or (2) the defendant committed

16

a lawful act, but acted with criminal negligence. (§ 192, subd. (b).) The court further instructed the jury that it must determine whether defendant committed the underlying crime of resisting, delaying, or obstructing a peace officer. (§ 148.) The jury was told to consider CALCRIM No. 2656 in determining whether defendant committed the underlying crime. CALCRIM No. 2656, as given to the jury, stated that, in order to find defendant committed the crime of resisting, delaying, or obstructing a peace officer, the jury must find that (1) defendant willfully resisted, obstructed or delayed officers Carrera and or Black in performing their duties and (2) knew or should have known that officers Carrera and Black were peace officers lawfully performing their duties as peace officers.

CALCRIM No. 580 included the following instruction on criminal negligence: "If you find that the defendant committed the following crime *and with criminal negligence*: resi[s]ting, delaying or obstructing a police officer and fighting with a police officer during the service of a facially valid warrant *or* if you find the defendant committed an otherwise lawful act *with criminal negligence*, you may not find the defendant guilty unless all of you agree that the People have proved that the defendant committed at least one of these alleged acts and you all agree that the same act or acts were proved." (Italics added.) This language clearly states that a finding of criminal negligence is required as to both involuntary manslaughter theories.

Citing *Butler*, *supra*, 187 Cal.App.4th 998, defendant argues that, although CALCRIM No. 580 defines the required intent, the court's response to Jury question No. 31 eliminated the required intent element for involuntary manslaughter based on the unlawful act theory. The court in *Butler*, at pages 1006-1007, stated that criminal

17

negligence is the *mens rea* element governing both theories of involuntary manslaughter. Criminal negligence exists "'when a man of ordinary prudence would foresee that the act would cause a high degree of risk of death or great bodily harm.'" (*Butler*, at p. 1008.)

The People argue that section 20 and *People v. Stuart* (1956) 47 Cal.2d 167 support the proposition that the underlying misdemeanor offense may supply the necessary criminal intent, and this was consistent with CALCRIM No. 580. Therefore there was no error in not instructing that a finding of criminal negligence was required as to the unlawful act theory. (*People v. Cox* (2000) 23 Cal.4th 665, 674 (*Cox*).) In *Cox*, citing *Stuart* at page 173, the court stated that "the 'act' underlying the offense of involuntary manslaughter 'must be committed with criminal intent or criminal negligence to be an unlawful act within the meaning of section 192.' [Citation.]" (*Cox*, at p. 672.) Section 20 states that, "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." In *Cox*, our high court also stated that the test is whether the crime is dangerous under the circumstances of its commission. (*Cox*, at p. 674; see also *People v. Wells* (1996) 12 Cal.4th 979, 988.)

In the instant case, the court instructed the jury that defendant committed involuntary manslaughter if defendant "committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed" (CALCRIM No. 580.) Furthermore, CALCRIM No. 2656, instructed the jury that in order to find that defendant committed the underlying crime of resisting, delaying or obstructing a peace officer, the jury must find that defendant acted willfully, or knowingly and intentionally, in committing the unlawful conduct of resisting, delaying or obstructing a peace officer.

18

CALCRIM No. 580, in conjunction with CALCRIM No. 2656, properly instructed the jury on the intent necessary to find defendant guilty of involuntary manslaughter based on the unlawful act theory. The court was not required to reiterate this in response to jury question No. 31. The court appropriately instructed the jury in its response that, if the jury was considering the unlawful act theory, the jury must decide whether defendant committed the crime of resisting, delaying or obstructing a peace officer, as described in CALCRIM No. 2652 (§ 148).

VI

JURY INSTRUCTION ON ACCIDENT DEFENSE

Defendant contends the trial court erred in failing sua sponte to instruct the jury on the defense to involuntary manslaughter of accident or misfortune. Defendant argues it was improper to modify the instruction on excusable homicide by accident, to preclude the jury from considering the defense of accident or misfortune if the jury found defendant knew the intruders were police.

The trial court instructed the jury on general homicide principles, including when murder is reduced to voluntary or involuntary manslaughter. The court also gave CALCRIM No. 510 on excusable homicide by accident, which states in part: "The defendant is not guilty of murder if he killed someone as a result of accident or misfortune." The court added, "This instruction does not apply if you find that the defendant knew it was the police or reasonably should have known it was the police." The court gave this modification in response to the prosecutor's argument that defendant could not run from the police, fight the police, or do anything to the police if he knew

19

they were officers.

Defendant argues that the accident instruction should have been given as a defense to manslaughter, as well as murder, because there was evidence defendant lawfully fled and resisted, not realizing the intruders were officers. Defendant further asserts the jury could have found that the gun discharged by accident or misfortune. The trial court concluded during discussion of the jury instructions that there was sufficient evidence to raise an inference that defendant did not initially know the intruders were the police, but the accident-misfortune instruction did not apply at the time of the shooting if defendant knew the intruders were police. Therefore the court added the following language to the accident-misfortune instruction: "This instruction does not apply if you find the defendant knew or should have known— [¶] It was the police." Defendant asserts the trial court should not have added this language to CALCRIM No. 510, to state that, if defendant knew the intruders were police, the jury could not rely on the accident defense. (CALCRIM No. 510.)

We conclude there was no instructional error because defendant did not object to the modification and did not request a pinpoint instruction on the accident defense, as applied to involuntary manslaughter. Our high court in *People v. Anderson* (2011) 51 Cal.4th 989, 992, 998, held that sua sponte instruction on accident is not required when the defense is raised to rebut the mental element of the charged crime.

In the instant case, the trial court properly instructed on the elements of involuntary manslaughter. "A trial court's responsibility to instruct on accident . . . generally extends no further than the obligation to provide, *upon request,* a pinpoint

20

instruction relating the evidence to the mental element required for the charged crime." (*Anderson*, *supra*, 51 Cal.4th at p. 998.) Since there was no defense request for an instruction on accident-misfortune as to involuntary manslaughter or objection to CALCRIM No. 510 as modified, the court was not required to instruct sua sponte on the supplemental theories of accidental gun discharge or misfortune. (*Anderson*, at p. 997.)

Relying on *People v. Jones* (1991) 234 Cal.App.3d 1303 [4th Dist., Div. Two], defendant argues the jury should not have been denied instruction on the accident defense merely because defendant knew or should have known an officer was involved in the confrontation. In *Jones*, this court held that the trial court erred in not instructing sua sponte on accident and misfortune, where the defendant shot a police officer during a traffic stop. (*Id.* at p. 1314.) The defendant was sitting in the front passenger seat during a traffic stop. When asked for identification, the defendant reached across his body, opened the car door, pulled out a shotgun from the space between the car seat and front passenger-side door, raised the gun, and pointed it toward the officer's head. As the officer made a sweeping motion with his hand to deflect the shotgun barrel away, the shotgun fired, striking the officer in the wrist, arm and lower chest. After the defendant was arrested, he told the arresting officer that he did not intend to shoot the officer who made the traffic stop. (*Id.* pp. 1308-1309.)

*Jones* is distinguishable in that, here, defendant did not argue he accidentally pulled the trigger and there was no substantial evidence that he lacked intent to fire the shotgun. To the contrary, substantial evidence established that discharge of the gun was not accidental. There was testimony the gun was fired three times and that pulling the

21

trigger required seven and a half pounds of pressure. We therefore conclude the trial court did not err in omitting instruction on the accident defense to involuntary manslaughter.

VII

INSTRUCTION ON SECTION 148 CRIME

Defendant contends the jury instructions on the section 148 crime of resisting, delaying or obstructing an officer, were incomplete. Specifically, the instructions did not properly instruct on the "engaged-in-duty" element and the prosecution's burden of proof. We conclude CALCRIM No. 2656, in conjunction with other instructions, properly instructed the jury on the section 148 crime.

The court and parties discussed the elements of a section 148 crime and agreed to a modified version of CALCRIM No. 2656, which took into consideration that, at the time of the offense, officers were serving defendant with a search warrant. The parties also agreed to special instruction No. 1, which instructed the jury regarding the lawful performance of officer duties and excessive force. CALCRIM No. 505, on self-defense, instructed the jury that special instruction No. 1 concerned whether an officer's use of force was unreasonable or excessive. In addition, the court gave a modified version of CALCRIM No. 2670, which instructed on the lawful performance of police officer duties and use of reasonable force. The court also gave CALCRIM Nos. 220 and 580 on reasonable doubt.

These instructions, as a whole, constituted comprehensive and complete instruction on the section 148 crime, as an underlying crime to involuntary manslaughter.

Defendant complains that special instruction No. 1 and modified CALCRIM No. 2670 did not tell the jury that in order to find defendant guilty of violating section 148, the prosecution must prove beyond a reasonable doubt that Black and Carrera were lawfully performing their duties. Also, the court did not specifically advise the jury that an officer acts unlawfully when he or she fails to provide knock-notice and uses excessive force. Defendant further complains that the jury was not instructed that the recipient of such force can lawfully use reasonable force to defend against unreasonable or excessive use of force.

With regard to instructing the jury on the prosecution's burden of proof, CALCRIM No. 2656, as modified, does not state that the prosecution must prove each element of a section 148 crime beyond a reasonable doubt. The instructions as a whole, however, provide sufficient instruction on the burden of proof as to each element. Such instruction was adequately provided by giving CALCRIM Nos. 220 and 580 on reasonable doubt.

We also reject defendant's other objections. CALCRIM No. 2656 was appropriately modified to address the particular circumstances of the instant case; that of defendant resisting officers who were executing a search warrant. The parties agreed to the instruction modifications and that the usual defenses did not apply to a section 148 crime if defendant knew officers were executing a search warrant. Defendant did not have the right to resist execution of a valid warrant. Because defendant agreed to the jury instruction modifications, without requesting any changes, he forfeited any objections on appeal. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142-1143; *People v. Lopez* (2011)

23

198 Cal.App.4th 1106, 1118-1119.)

We further conclude CALCRIM No. 2656, along with special instruction No. 1 and CALCRIM Nos. 505, 580, and 2670, adequately instructed the jury on the elements of a section 148 crime. The jury was instructed that it must find that the officers were lawfully performing their duties, and that an officer is not acting lawfully if he or she serves a search warrant without providing knock-notice or uses excessive force, as defined in CALCRIM No. 2670 and special instruction No. 1 (CALCRIM No. 2656).

There also was no error in the trial court failing to instruct that a person may use reasonable force to defend himself or herself against excessive police force. Such instruction was not required because this case involved the police executing a search warrant. Therefore, as the parties agreed during a discussion of the instructions, defendant did not have a right to resist execution of the search warrant if he knew the intruders were police officers. The instructions further stated that, if the officers were using excessive force, they were not lawfully performing their duties and therefore there would be no section 148 violation.

Although CALCRIM No. 2670, which instructs on reasonable force, only refers to Carrera lawfully performing his duties, CALCRIM No. 2656, as modified, refers to both Carrera and Black. CALCRIM No. 2656 instructs that, to find defendant guilty of a section 148 crime, the jury must find that Carrera and Black were lawfully performing their duties as peace officers, and such duties included executing a search warrant. The court further explained in CALCRIM No. 2656 that using excessive force and not providing knock-notice constituted unlawful performance of an officer's duties. We

24

conclude the instructions as a whole provided proper, complete instruction on each element of a section 148 offense.

## SPECIAL INSTRUCTION NO. 1

Defendant contends special instruction No. 1 is an improper pinpoint instruction because it interjected expert testimony into the court's charge on the factual issues of lawful performance and self-defense. Defendant argues special instruction No. 1 is argumentative and singled-out and gave undue emphasis to the prosecution expert's testimony. The instruction removed from the jury the factual issue of whether the officers acted lawfully and with reasonable force.

The court gave CALCRIM No. 505 on justifiable homicide, based on self-defense or defense of another. The instruction states that the instruction does not apply "if the defendant knew or reasonably should have known that the individuals that entered his apartment were police officers, unless the officers used unreasonable or excessive force." The jury was further instructed to "Please refer to special instruction # 1 that will be provided on whether an officer's use of force was unreasonable or excessive."

Special instruction No. 1 stated that, during service of a search warrant, an officer could use reasonable force to detain occupants of a residence. A person who knows he or she is being detained for this purpose has no right to resist. An officer may use greater force than used in self-defense to control the situation. Special instruction No. 1 also defined "reasonable force," which was to be evaluated based on an objective standard. In addition, the trial court gave CALCRIM No. 332 on evaluating expert witness testimony.

The jury was told it was not required to accept an expert's opinion as true and correct. The jury could disregard expert opinion if the jury found it was "unbelievable, unreasonable, or unsupported by the evidence."

Defendant argues that special instruction No. 1 was an improper, argumentative pinpoint instruction that directed the jury's attention to expert testimony of San Bernardino County Sheriff's Department Deputy Chief Robert Fonzi and implied the conclusion to be drawn from such evidence. Defendant cites the leading case of *People v. Wright* (1988) 45 Cal.3d 1126, in which the California Supreme Court held that the trial court erred in refusing to give defendant's proposed instruction on eyewitness identification factors. (*Id.* at p. 1144.) *Wright* held that the trial court properly refused to give a jury instruction proposed by the defendant on grounds that it was argumentative, "i.e., it would invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact, and therefore properly belongs not in instructions, but in the arguments of counsel to the jury." (*Id.* at p. 1135.) The court therefore disapproved "'the common practice [of] [selecting] certain material facts, or those which are deemed to be material, and endeavoring to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law,' and we explained, 'An instruction should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue.' [Citations.]" (*Ibid.*, fn. omitted.)

Here, special instruction No. 1 was created by inserting into CALCRIM No. 2670,

language taken from *Graham v. Connor* (1989) 490 U.S. 386, 396-397 (*Graham*), and statements made during Fonzi's expert testimony. Citing *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, defendant argues that the inserted language in the instruction was argumentative and improper. In *Munoz*, the court recognized that a similar reasonable force instruction, which relied on language in *Graham*, was legally correct but held there was no error in *not giving the instruction* to the jury. The *Munoz* court reasoned that the instruction was argumentative because it directed the jury's attention to only one aspect of the evidence. (*Munoz*, at p. 1108.)

*Munoz* is distinguishable because it concerns the trial court rejecting the instruction, whereas in the instant case, the court permitted the instruction at issue. Furthermore, the court in *Munoz* stated that the instruction's language from *Graham* correctly stated that "the reasonableness of a particular use of force is judged from the perspective of a reasonable officer on the scene, not by the 20/20 vision of hindsight. The inquiry is an objective one . . . ." This is essentially the same language included in special instruction No. 1. As *Munoz* recognized, the language correctly states the applicable legal standard and therefore is not improper or argumentative. Also, in *Munoz*, the trial court gave an instruction on reasonable force, such that the excluded instruction in question was repetitive. Here, the trial court did not give any other instruction that was repetitive of the instruction on reasonable force provided in special instruction No. 1.

Special instruction No. 1 was not an improper, argumentative pinpoint instruction. The instruction, in conjunction with CALCRIM No. 332 on evaluating expert witness

27

testimony, CALCRIM No. 226 on witness credibility, and CALCRIM No. 222 on evaluating evidence, merely defined general principles of law applicable to the factual situation presented by the evidence. The generic principles correctly stated in the instruction were applicable to all cases raising issues of lawful performance by peace officers, reasonable force, and self-defense. Special instruction No. 1 did not direct the jury to specific evidence, such as Fonzi's testimony. Nor did the court tell the jury it must believe Fonzi's testimony or direct the jury to find that the officers used reasonable force. Special instruction No. 1 instructs the jury appropriately on how to evaluate whether the officers used reasonable force, reminding the jurors that they "are the sole judge of the facts at the time the shots were fired," and nothing the court tells them should suggest to the jury that the court is deciding the facts a particular way.

IX

USE-OF-FORCE EXPERT TESTIMONY

Defendant contends expert testimony by Fonzi on use-of-force constituted prejudicial error because it invaded the province of the jury and lessened the prosecution's burden of proof, in violation of defendant's constitutional rights. We disagree.

Fonzi's expert testimony was relevant to defendant's defense of justifiable homicide based on self-defense. This defense applied, even if defendant knew he was detained by police officers, if the police officers used unreasonable or excessive force. Fonzi testified about the use of SWAT teams to serve search warrants, and explained concepts of use and escalation of force to detain or arrest suspects, overcome resistance,

28

and prevent escape. Fonzi also explained various factors that are considered in determining whether the use of force is reasonable. Fonzi answered hypothetical questions that were closely tailored to the facts in the instant case. When asked if he had any opinions concerning the procedures and the use of force by officers in the instant case, Fonzi stated that the SWAT team appropriately executed the search warrant on defendant, and officers Black, Jones, Partida, and Guerrero used reasonable force under the circumstances known to them at the time.

Defendant argues that the jury was capable of evaluating and deciding, without the assistance of expert testimony, the issues of whether defendant was justified in trying to flee, whether his fleeing was reasonable, whether the officers lawfully entered his home and performed their duties lawfully, whether the officers used reasonable or excessive force in detaining defendant, and whether defendant was justified in defending himself against the officers. Defendant also argues Fonzi's testimony exceeded the scope of acceptable expert testimony by providing opinion testimony on the ultimate issue of whether the officers were acting lawfully, without excessive force. The People contend defendant has forfeited his challenge to Fonzi's expert testimony by failing to object at trial. We agree. Because defendant did not object to Fonzi's expert testimony and did not give the court the opportunity to rule on the objection and admonish the jury, or give the prosecutor a chance to rephrase questions, defendant forfeited these arguments on appeal. (*People v. Welch* (1972) 8 Cal.3d 106, 114-115; see also Evid. Code, § 353.)

Defendant alternatively argues that if his counsel forfeited his objection to Fonzi's testimony, defendant was deprived of his constitutional right to effective assistance of

29

counsel. We reject this claim as well. In order to prove defendant's counsel was ineffective, defendant has the burden of establishing that: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) To prove that counsel's performance was deficient, defendant must affirmatively show counsel's deficiency involved a crucial issue, which cannot be explained on the basis of any knowledgeable choice of tactics. (*People v. Floyd* (1970) 1 Cal.3d 694, 709, disapproved on another point in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.)

The failure to object to evidence ordinarily involves tactical decisions by counsel "and seldom establish[es] a counsel's incompetence." (*People v. Frierson* (1979) 25 Cal.3d 142, 158.) "Matters involving trial tactics are matters 'as to which we will not ordinarily exercise judicial hindsight. [Citations.]' [Citation.] 'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel. [Citations.]' [Citations.]" (*People v. Najera* (1972) 8 Cal.3d 504, 516.)

We note that the prosecutor's hypothetical questions were not objectionable on the ground they mirrored the facts of the case; indeed, the hypothetical "must be rooted in facts shown by the evidence." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) As our state Supreme Court recently stated: "[T]he prosecutor's hypothetical questions had to be based on what the evidence showed these defendants did, not what someone else might

30

have done." (*People v. Vang* (2011) 52 Cal.4th 1038, 1046 (*Vang*).) Thus, "it is not a legitimate objection that the questioner failed to disguise the fact the question was based on the evidence." (*Id.* at p. 1051.) Moreover, "expert testimony is permitted even if it embraces the ultimate issue to be decided." (*Id.* at p. 1049; see also Evid. Code, § 805.)

Furthermore, defendant has not shown there was no possible tactical reason for his trial attorney's failure to object. This is because it is not likely that the trial court would have sustained an objection to Fonzi's testimony, since the testimony was relevant and did not improperly usurp the jury's fact-finding function or constitute improper hypothetical testimony. (*Vang*, *supra*, 52 Cal.4th at pp. 1045, 1051.) Accordingly, we conclude defendant forfeited his objection to Fonzi's use-of-force testimony and, even if not forfeited, Fonzi's testimony was proper and defendant has not established ineffective assistance of counsel.

X

PERSONAL USE OF A FIREARM

In a second trial, the jury found true the personal use enhancement. (§ 12022.5, subd. (a).) Defendant contends there was insufficient evidence of the enhancement because the prosecution failed to prove that defendant personally and intentionally used a firearm to commit the underlying involuntary manslaughter offense. Defendant argues there was no evidence he personally fired Black's rifle or that he did so intentionally.

Under section 12022.5, subdivision (a), "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a

31

firearm is an element of that offense." This enhancement requires a finding of gun-related *conduct* coupled with facilitative *intent*. (*Alvarado v. Superior Court* (2007) 146 Cal.App.4th 993, 1003, 1005 (*Alvarado*).)

Section 12022.5 requires only a general intent to use a firearm. "At its core, defendant's claim is that a gun is not used 'in the commission of' a crime unless the gun user *subjectively intends* to utilize the gun to accomplish the crime. We do not read the 'in the commission of' requirement to add a specific intent requirement to the enhancement but rather to require a particular attendant circumstance. A gun use occurs 'in the commission of' an offense if the gun use in fact *objectively facilitated* the commission of the offense. The issue is not one of the gun user's *subjective* mental state but of the *objective role* that the gun use played in the commission of the crime. The 'in the commission of' element of a personal use enhancement does not encompass a specific intent requirement." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1495.)

Here, there was substantial evidence from which it could be reasonably inferred that defendant personally and deliberately discharged Black's rifle, resulting in one of the fired bullets killing Carrera. Such evidence included evidence that one of the three bullets discharged from Black's rifle killed Carrera, and the rifle could not have been fired accidentally or involuntarily, since 7.5 pounds of pressure was required to pull the trigger each time the rifle fired a bullet. There was also evidence that Black was pummeling defendant with both hands when the shots were fired, indicating Black did not fire the rifle, and Black testified he did not pull the trigger. Also, there was evidence that, while Black and defendant violently fought, the rifle was sandwiched between

32

defendant and Black, and when fired, the rifle was seen underneath Black's right arm pit pointing toward the doorway where Carrera was standing. While defendant and Black were fighting on the ground, defendant's hands were also sandwiched between defendant's and Black's bodies near the rifle. In addition, there was forensic evidence that defendant was a possible contributor to DNA evidence found on the rifle frame above the grip and in the trigger area. Gunshot residue was found on defendant's hands. Reconstruction evidence, including the reenactment and trajectory analysis, showed that defendant could have fired the rifle, and the shooting was consistent with the officers' descriptions of the course of events and circumstances leading to Carrera's death.

Defendant argues the evidence was insufficient because there was evidence refuting that defendant intentionally fired Black's rifle. But the lower court, not the reviewing court, resolves conflicts in the evidence. "[I]t is black letter law that '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.]" (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.) When a jury resolves the credibility issues against the defendant, the reviewing court is "bound by that resolution." (*Ibid.*) Therefore, any conflict in the evidence supporting the personal use enhancement does not render the evidence supporting the enhancement insufficient.

## XI

## JURY INSTRUCTION ON PERSONAL USE ENHANCEMENT

Defendant contends the trial court gave the jury an incorrect modified version of CALCRIM No. 3146, which instructs on the personal use enhancement. (§ 12022.5.) Specifically, defendant argues the modified instruction incorrectly defined "personal use of a firearm." CALCRIM No. 3146 defines "personal use of a firearm" as follows: "Someone *personally uses* a firearm if he or she intentionally does any of the following: [¶] 1 Displays the weapon in a menacing manner; [¶] 2 Hits someone with the weapon; [¶] OR [¶] 3 Fires the weapon."

Because the circumstances in the instant case were unique, the trial court modified CALCRIM No. 3146, over defendant's objection, to add that a defendant also personally uses a firearm under section 12022.5 when he or she: "4. Possesses, grabs, handles or controls the weapon knowing it's a weapon during the course of a struggle. [¶] Two or more people may possess something at the same time. [¶] It is possible to find a personal use even if the weapon is not pointed at the victim or the defendant does not issue explicit threats of harm toward the victim or a third person. [¶] It is not required that a victim be aware of the weapon to find that a defendant personally used the weapon. [¶] It is possible to find a personal use of a weapon even if the use is directed toward someone other than the victim of that crime."

Defendant asserts that this additional "personal use" allowed the jury to find true the enhancement based on an erroneous legal theory. This instructional error, defendant

argues, constitutes *Guiton*[2] error, which arises "'when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand.'" (*Guiton*, at p. 1122; see also *People v. Morales* (2001) 25 Cal.4th 34, 43.) Defendant further argues it is apparent the instructional error was prejudicial because the instructional error did not exist in the first trial and the jury was unable to reach a finding on the personal use enhancement. Therefore the verdict in the second trial, in which the jury found true the enhancement, could be attributable to the erroneously modified CALCRIM No. 3146 instruction given to the jury in the second trial.

The issue here is whether the mere possessing, grabbing, handling, or controlling a gun during the course of a struggle with a peace officer constitutes "personal use of a firearm" within the meaning of section 12022.5, rather than a mere "arming."[3] The phrase "use of a firearm" means "to display a firearm in a menacing manner, to intentionally fire it, to intentionally strike or hit a human being with it, or to use it in any manner that qualifies under Section 12022.5." (§ 1203.06, subd. (b)(2).[4]) "'"Use"

---

[2] *People v. Guiton* (1993) 4 Cal.4th 1116.

[3] We recognize there is no mention of peace officers in the instruction but it is undisputed officers were involved and therefore it was not necessary to state this in the instruction.

[4] "The definition of personal use given in section 1203.06 has been accepted as applicable to section 12022.5(a)." (*People v. Johnson* (1995) 38 Cal.App.4th 1315, 1319.)

means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." (Webster's New Internat. Dict. (3d ed. 1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' [Citation.]" (*People v. Wardell*, *supra*, 162 Cal.App.4th at p. 1492.) "[A] gun is 'used' when there is evidence of gun-related *conduct* coupled with the intent the gun-related action *facilitate the crime . . . .*" (*Alvarado*, *supra*, 146 Cal.App.4th at p. 1005.)

Under the unique circumstances in the instant case, the trial court did not err or expand the law ex post facto by modifying CALCRIM No. 3146, to add the fourth "personal use" of possessing, grabbing, handling, or controlling a gun during the course of a struggle. Such acts were committed while an armed peace officer was attempting to apprehend defendant and the gun belonged to an officer. Defendant's act of taking or grabbing an officer's gun during a struggle with a peace officer who was attempting to execute a search warrant constituted more than a mere arming. Such conduct could even be found to qualify as the personal use of displaying a weapon in a menacing manner. While normally possessing, grabbing, handling, or controlling a gun, alone, would not constitute personal use of a firearm under section 12022.5, here the conduct qualified as a "personal use" under section 12022.5 because it occurred during a struggle with a peace officer and involved the officer's gun. We accordingly reject defendant's objection to CALCRIM No. 3146 as modified.

XII

CALCRIM NO. 3146 PINPOINT INSTRUCTION

Defendant contends the trial court erred in refusing to give a pinpoint instruction modifying CALCRIM No. 3146. Defendant's proposed pinpoint instruction placed the word "intentionally" in front of each of the four subpoints defining "use" in CALCRIM No. 3146, and added a sentence informing the jury that incidental or inadvertent use of a firearm is not personal use.

A trial court has a duty to instruct the jury on matters closely and openly connected with the facts in evidence and necessary to the jury's understanding of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) A court must give instructions "pinpointing" the defense theory when defendant requests them and where substantial evidence supports the theory. (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)

In the instant case, CALCRIM No. 3146, as modified, adequately and properly instructed the jury on the personal use enhancement. The pinpoint language defendant requested was appropriately rejected because it was repetitive of instructions already given. (*People v. Farmer* (1989) 47 Cal.3d 888, 913.) The modified CALCRIM No. 3146 instruction given to the jury clearly states that intent was required as to each of the four types of "personal use," by prefacing the four enumerated personal uses, with the statement, when defendant "intentionally does any of the following." Adding the word intentional again before each of the four types of personal use would have been unnecessarily repetitive.

We further note that it appears from the portion of the transcript cited by defendant

37

in his appellate opening brief, that defendant did not request a pinpoint instruction inserting the word, "intentional" before each of the four listed types of personal use. Failure to request a pinpoint instruction in the trial court forfeits the issue on appeal. (*People v. Cox* (1991) 53 Cal.3d 618, 669.) "'. . . defendant is not entitled to remain mute at trial and scream foul on appeal for the court's failure to expand, modify, and refine standardized jury instructions.'" (*People v. Valentine* (2001) 93 Cal.App.4th 1241, 1246-1247, quoting *People v. Daya* (1994) 29 Cal.App.4th 697, 714.)

Furthermore, by stating that each of the four types of personal use must be intentional, there was no need additionally to specify that incidental or inadvertent use of a firearm is not personal use. "A trial court is not required to give pinpoint instructions that merely duplicate other instructions." (*People v. Panah* (2005) 35 Cal.4th 395, 486.) Accordingly, the trial court did not err in refusing to give defendant's superfluous pinpoint instruction.

## XIII

## ADMISSIBILITY OF SERGEANT GILLIAM'S TESTIMONY

Defendant contends the trial court abused its discretion in excluding from both trials Sheriff's Sergeant Gilliam's testimony regarding the investigators' initial theory that the rifle was discharged accidentally.

Gilliam arrived at defendant's home to investigate right after the shooting. He attended a briefing, during which he was given a rough idea of what had occurred. One of the officers conducting the briefing said that the shooting was believed to have been an accidental discharge of an officer's weapon. Based on information provided at the

38

briefing, Gilliam drafted a new search warrant for defendant's home. Gilliam stated in his declaration of probable cause that, during the altercation between defendant and an officer, "it is believed that one of the Rialto Police Officer's weapons accidentally discharged, striking Rialto Police Officer Sergio Carrera in the side of the face."

Before the first trial, the trial court held an Evidence Code section 402 hearing (402 hearing) to determine whether defendant could introduce evidence of Gilliam's affidavit statement that it was believed an officer's gun accidentally discharged. Gilliam testified at the 402 hearing that he wrote the statement before he had done any investigation or interviews, and assumed that the discharge was accidental because one of the officer's weapons was involved and it was stated during the briefing that the discharge was believed to have been accidental. Gilliam did not know any of the circumstances surrounding the gun discharge other than that the weapon belonged to an officer. Gilliam had not yet spoken to Black, Jones, or anyone else with the Rialto Police Department. When he wrote his affidavit, he did not have any information as to how the weapon discharged.

The trial court ruled that Gilliam's testimony was inadmissible other than for impeachment of the original declarant. The court also stated that his testimony concerned multiple hearsay and there was a lack of foundation as to the basis of knowledge of the declarant.

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) No such abuse occurred here. Although defendant argues Gilliam's testimony would not be used to establish the truth

39

of the statement that the rifle was believed to have discharged accidentally, the testimony would have had no other relevancy. Gilliam's testimony therefore constituted inadmissible multiple hearsay used to prove the rifle discharged accidentally. Gilliam's probable cause statement was based on the statement of an unidentified declarant and the basis or foundation for the statement was unknown. Furthermore, Gilliam speculated that the rifle fired accidentally merely because the rifle belonged to another officer.

Defendant argues Gilliam's testimony did not constitute inadmissible hearsay because it would be used to show the investigators' course of investigation and state of mind, not that the rifle fired accidentally. But since the statement Gilliam relied upon was made during a preliminary briefing, right after the shooting, before the officers had investigated the incident, the belief was speculative. Without establishing any well-founded basis for the belief that the rifle was discharged accidentally, there was no abuse of discretion in excluding Gilliam's testimony. There was no evidence presented at the 402 hearing showing that the declarant's statement was anything other than speculation since the investigation had not yet begun.

XIV

EXCLUSION OF TESTIMONY BY BELL, HICE, AND GUERRERO

Defendant asserts that during the second trial, the trial court erred in excluding the testimony of defendant's girlfriend, Nashalia Bell, and Officers Hice and Guerrero. Defendant contends their testimony would have established defendant's state of mind, the lighting conditions, and the officers' demeanor and state of mind. This evidence, defendant argues, was relevant to refute the prosecution's theory that defendant

40

intentionally fired Black's rifle during his violent struggle with Black. We conclude the evidence was not relevant to proving the firearm personal use enhancement, and even if it was relevant, exclusion of the evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Defendant argues the trial court should have permitted Bell's testimony that, when the SWAT team entered defendant's home, defendant was startled out of a deep sleep. Defendant claims this was relevant to showing defendant's state of mind, that he was not entirely awake and did not fully grasp what was occurring or who the intruders were. The only evidence of this was that defendant was asleep on the living room couch when the SWAT team burst into defendant's home, with a loud "flashbang." There was no evidence that thereafter defendant was not fully awake or aware that officers were serving a search warrant on him. There was overwhelming evidence establishing that, by the time Black's rifle was fired, defendant was wide awake. He had run down the hallway with the SWAT team pursuing him, repeatedly yelling, "Police department. Search warrant." In addition, defendant had punched Black in the face and, when the rifle discharged, defendant and Black were on the floor, violently fighting each other. During the fight, Black had yelled, "police department" and, "Stop resisting," and Jones had yelled, "Taser, Taser, Taser." Bell's testimony that defendant was startled out of a deep sleep would have added little, if anything, and there was no prejudice in excluding the evidence. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant also argues the trial court erred in excluding Hice and Guerrero's testimony that defendant's house was dimly lit and the hallway was darker than the

41

kitchen.  Defendant asserts that this testimony was relevant to show the bedroom at the end of the hallway was dark and therefore defendant was unaware of Black's weapon.  Such evidence, defendant argues, refuted that defendant intentionally grabbed Black's rifle, displayed it in a menacing manner, and fired it.  Hice and Guerrero's testimony on the lighting was of little relevance since Hice and Guerrero were in the kitchen, not in the back bedroom where the gun was fired.  In addition, it was unrefuted that Black entered the room with his rifle drawn and defendant punched him in the face, indicating that there was enough light for defendant to see Black and his rifle.  Even if Hice's and Guerrero's testimony was relevant and they had been permitted to testify regarding the lighting, it is unlikely the trial outcome would have been any different.  (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant further objects to exclusion of Guerrero's testimony establishing that immediately after the shooting, none of the officers directly involved knew how the gun fired.  This evidence, defendant argues, corroborates the defense that whatever caused the gun to discharge could not be determined or attributed solely to defendant.  But there was already evidence that the officers who were in the room (Black and Jones) admitted they did not know how the rifle fired, and Guerrero's testimony concerned circumstances and the state of mind of officers after the shooting incident.  Guerrero was not a percipient witness to the shooting.  He was not in the room when the gun discharged.  Therefore his testimony was irrelevant, lacked foundation, and was potentially misleading.

DEFENDANT'S *PITCHESS*[5] MOTION

Defendant requests this court to review independently the trial court's in camera hearing on defendant's *Pitchess* motions to determine whether the trial court improperly withheld any records. Defendant seeks records that impeach the officers' credibility and support his claims that the officers were attempting to conceal the truth by blaming him for the shooting and were not engaged in the lawful performance of their duties.

Pursuant to a *Pitchess* motion, on June 19, 2009, the trial court reviewed in camera the personnel records of Black, Guerrero, and Jones for complaints regarding excessive force. The trial court found no relevant complaints as to Jones and Guerrero, and found one complaint as to Black, which the court turned over to defense counsel. In response to a supplemental *Pitchess* motion, on September 25, 2009, the trial court reviewed in camera personnel records of officers Becnel, Hice, Karol, Partida, Jones, Guerrero, Vigil, Black, Quinonez, and Quarker, regarding allegations of dishonesty, filing false police reports, and other official misconduct. The trial court found no discoverable records as to any of the officers.

A. *Applicable Law*

In *Pitchess*, *supra*, 11 Cal.3d 531, the court held that a criminal defendant could "compel discovery" of certain information in police officer personnel files by demonstrating good cause. Good cause is demonstrated by making "general allegations

---

[5] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

which establish some cause for discovery" of the information and by showing how it would support a defense to the charge against him. (*Id.* at pp. 536-538.) In 1978, the California Legislature codified the holding in *Pitchess* by enacting Penal Code sections 832.7 and 832.8 and Evidence Code sections 1043 through 1045. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 81-82 (*Santa Cruz*).) To initiate discovery of such records, the defendant must file a written noticed motion supported by affidavits showing "good cause for the discovery or disclosure sought, setting forth the materiality" of the information to the pending litigation, and "stating upon reasonable belief" that the police agency has the records or information sought. (Evid. Code, § 1043, subd. (b)(3); see also *Santa Cruz*, at p. 82.)

When the trial court reviews an officer's files in camera and then denies disclosure of information, the reviewing court should examine the materials to determine whether the lower court abused its discretion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232 (*Mooc*).) The custodian of the personnel records is required to provide "all potentially relevant" materials to the court. (*Id.* at p. 1228-1229.) The court reviews the files in camera with a court reporter present. (*Ibid.*) The custodian should state on the record what other documents contained in the file were not presented to the court and why those were deemed irrelevant or otherwise nonresponsive to the *Pitchess* motion. (*Mooc*, at p. 1229.) The court then makes a record of what it has reviewed. (*Ibid.*) The trial court has broad discretion in ruling on both the good cause and disclosure components of a *Pitchess* motion, and a reviewing court will not reverse the trial court's rulings absent a showing that the trial court abused its discretion. (*Haggerty v. Superior Court* (2004) 117

44

Cal.App.4th 1079, 1086.)

*B. Discussion*

This court has conducted an independent *Pitchess* review and concludes that the trial court did not abuse its discretion in finding no discoverable records, other than those produced. (*Mooc*, *supra*, 26 Cal.4th at pp. 1229-1232.) We have reviewed the reporter's transcript of the in camera hearing on defendant's *Pitchess* motions. We conclude that there are no records, other than those produced, containing discoverable material pertinent to the officers' credibility or excessive use of force. It appears from the record that the officials of the City of Rialto and Rialto Police Department produced all records that were potentially responsive to the motion. (*Id.* at p. 1230 [custodian of records obligated to produce documents that are "potentially responsive" to the defendant's request, and trial court is to determine whether all potentially responsive documents have been produced].)

XVI

DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


HOLLENHORST
Acting P. J.


RICHLI
J.